### RILEY & Co. *v.* UNITED STATES (No. 1800).[1]

1. CONSTRUCTION, PARAGRAPH 289, TARIFF ACT OF 1913—AIDED BY TARIFF HISTORY—"BLANKETS."

The history of the enactment of successive tariff acts, together with administrative and judicial decisions under them, shows that Congress used the word "blanket" as meaning a heavy cover for a bed or a horse, with a thick, soft nap on both sides. The word will be given that meaning in paragraph 289, tariff act of 1913.

2. LAP ROBES—STEAMER RUGS.

Woven woolen spreads of mixed colors, some with fringed ends and some with bound edges, used to cover the legs and body in automobiles, on couches, in carriages, at seacoast resorts, and in hospitals and sanitariums, are not dutiable under paragraph 289, tariff act of 1913 as blankets. Their classification as woolen manufactures, paragraph 288, is affirmed.

### United States Court of Customs Appeals, May 14, 1917.

APPEAL from Board of United States General Appraisers, Abstract 40393.

[Affirmed.]

*Walter Evans Hampton* for appellant.

*Bert Hanson,* Assistant Attorney General (*Charles D. Lawrence,* special attorney, of counsel), for the United States.

[Oral argument April 26, 1917, by Mr. Hampton and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:

The importers contend that the present merchandise is woolen blankets, and should be assessed with duty at 25 per cent ad valorem under the eo nomine provision for "blankets * * * composed wholly or in chief value of wool" contained in paragraph 289 of the tariff act of 1913.

The Government contends that the articles are not blankets but are lap robes, steamer rugs, or auto rugs, and are dutiable at 35 per cent ad valorem under the provision for all manufactures of every description composed wholly or in chief value of wool, not specially provided for, contained in paragraph 288 of the same act.

The goods were assessed in accordance with the Government's claim; the importers presented their claim by protest; the Board of

---

[1] T. D. 37225 (32 Treas. Dec., 628).

General Appraisers overruled the protest and the importers now appeal.

The articles in question are woven woolen spreads of mixed colors, some with fringes upon the ends and some with bound edges. They are 72 inches in length and 60 and 64 inches in width. Their use is explained in the following manner by one of the importers, Mr. Young, who was a witness before the board:

Q. In selling these articles here for use in this country, do you know to what use they are put?—A. They are used for covering the legs and bodies of human beings; they are sold for that purpose to be used in automobiles, on couches, in carriages, at seacoast resorts, in hospitals for invalids, and in sanitariums.

   *       *       *       *       *       *       *

Q. Have you used either of these two rugs, or whatever you call them, to keep your body warm?—A. Not those identical ones.

Q. I mean ones like these?—A. Yes, sir.

Q. In what way—in an automobile?—A. Yes, sir.

Q. Have you used them on a steamer?—A. Yes.

Q. So that you might say they are steamer rugs or used for steamer rugs?—A. Yes.

Q. They have the purpose of steamer rugs or steamer shawls, perhaps?—A. Yes.

Q. Is that so of both of them?—A. Yes.

Q. Do you know whether either of them has been used as a blanket over a person reclining to serve the purpose served by a blanket on a recumbent person?—A. Yes.

Q. In bed?—A. Yes.

Q. In lieu of the ordinary blankets that we see on beds?—A. In lieu of them and in addition to them, too.

Q. In addition to a blanket put over them as an extra covering?—A. Yes; and in lieu of a blanket, as well.

Q. For instance, a person lying on a couch might put some kind of a shawl or rug or covering of some kind like this over them?—A. Yes.

   *       *       *       *       *       *       *

Q. In other words, it is something like a quilt or counterpane; it serves the purpose of something put over incidentally just as a quilt or counterpane might be put on?—A. Not necessarily incidentally; if you were in camp you would find it is not used incidentally.

Q. How about serving the purpose of a blanket in one's house, where blankets of the ordinary kind are ordinarily used, would you say you have seen or you know that either of these two rugs would be used ordinarily that way to take the place of blankets of the kind ordinarily used?—A. Yes; I have seen them used that way; I have used them for that myself.

Q. To what extent are they used that way as compared to the ordinary house blankets?—A. Only a small percentage.

Q. As a regular thing you don't retire with one of these over a person in lieu of the ordinary blanket?—A. Not ordinarily.

The foregoing testimony, taken in connection with the exhibits and the other testimony in the record, sufficiently discloses the character and use of the articles in question. They are such robes or rugs as are familiarly used in carriages and automobiles, or upon porches or steamers, or upon invalid chairs or couches, and are generally known as lap robes, carriage or auto rugs, or as traveling or steamer rugs. They differ in use and character from ordinary bed

blankets, and are only exceptionally used upon beds in place of these. The sole issue in the case is whether such articles are "blankets" within the purview of paragraph 289 of the tariff act of 1913. The record does not establish a commercial designation; therefore we must look to the ordinary use of the term and the tariff history of the subject.

The following definitions of the word "blanket" are taken from standard dictionaries:

Century Dictionary:

A large oblong piece of soft, loosely woven woolen cloth, used for the sake of its warmth as a bed covering, or (usually made of coarser material and closer texture) as a covering for a horse when standing or exposed to cold, and sometimes worn as a garment, especially among rude or uncivilized people.

Standard Dictionary:

A sheet of heavy woolen cloth, or of mixed wool and cotton, usually having a nap, used for a bed covering, for a garment, or to cover a horse or other animal.

Oxford Dictionary:

A large oblong sheet of soft loose woolen cloth, used for the purpose of retaining heat, chiefly as one of the principal coverings of a bed; also for throwing over a horse, and by savages or destitute persons for clothing.

These definitions militate against the claim of the importers. These articles are certainly not designed for use as bed coverings nor do they enjoy any general use as such; they are not used as "garments," nor are they used as coverings for animals. The clear effect of the definitions is that the word "blankets," standing alone, applies only to appropriate bed coverings and to coverings for horses or like animals. Their suggested use as garments has no practical bearing upon the present case. Therefore upon the definitions contained in the dictionaries we would feel constrained to hold against the contention of the importers, but the tariff history of the subject tends even more conclusively to such a result.

The eo nomine classification of "blankets" occurs in the tariff acts of 1816, 1824, 1832, 1842, 1846, 1861, 1862, 1864, 1867, 1883, 1890, 1894, 1897, 1909, and 1913. The question early arose whether the term as thus used included also steamer rugs and like articles, and a review of the authorities discloses the fact that while the department and the courts at times held that such articles should be assessed under the eo nomine provision for "rugs" they never at any time prior to the enactment of the present tariff act held them to be assessable under the designation of "blankets."

The following extract is taken from the decision of the Circuit Court of Appeals, Second Circuit, by Shipman, Circuit Judge, in the case of Ingersoll v. Magone (53 Fed., 1008–1010):

Since 1859, when the question arose in regard to the classification of traveling rugs, as between "blankets" and "manufactures of wool," the proper classification of these articles has been occasionally the subject of discussion in the Treasury Department. In 1866 and 1869 the department decided that they should be classified as manufactures of wool not otherwise provided for. A similar decision seems to have been made in 1870. In 1888 the department decided to modify its previous rulings, and to concede that these articles should be classed as rugs, upon the ground that they were such both under the comprehension and the commercial significations of the word. The only testimony in the record in regard to commercial designation, and which was given for the purpose of distinguishing the importations from shawls, was from a witness who said that they were always and prior to March, 1883, bought and sold by the name of "traveling rugs," and that he had never heard them called "shawls."

On September 21, 1859, the department held that certain carriage robes or traveling rugs, which were not commercially known as blankets, were not blankets within the meaning of the law and were assessable as manufactures of wool and hair. This decision was not published when made but later was given effectual publication in T. D. 7298.

In the year 1869 the department published a report that "certain (so styled) 'rugs' were, on examination, decided by the collector and the department to be 'manufactures of wool, not otherwise provided for,' liable to duty at the rate of 40 cents per pound and 35 per cent ad valorem." (T. D. 449.)

On January 4, 1886, the department followed the ruling first above referred to, and again issued letters of instruction to the effect that carriage robes or traveling rugs which were not commercially known as blankets should be classified as manufactures of wool and hair rather than as blankets. (T. D. 7298.)

On March 2, 1888, the department in a letter of instruction referred with implied approval to the rulings above cited, to the effect that the articles therein described, namely, certain "carriage and sleigh robes for wrapping on railway cars as traveling robes or blankets, and for house purposes for coverings for sofas, etc.," which were commercially known as "rugs," should not be assessed under the provision for "blankets," but under that for "all other * * * rugs." (T. D. 8702.)

On July 23, 1900, in the Walz case, G. A. 4730 (T. D. 22377), the board held that certain Mexican woolen blankets known as "zarapes" were dutiable as "blankets." The following extract from that decision is illuminating:

The return of the classifying officer shows that he assessed duty under paragraph 370 on the theory that the articles are shawls or wearing apparel, but the evidence introduced on the hearing shows that the articles are blankets, so known commercially and used as such, although they are sometimes used by Mexicans as shawls or wraps during the day. There are two kinds of zarapes used by Mexicans. One, which appears to be intended for use generally as a shawl or wrap, and in which holes or slits are made for the purpose of inserting the arms of the wearer, and one which is intended

to be commonly used as a blanket and has no hole or opening for the arms. The merchandise in dispute is of the latter species, and the evidence before us shows that these are never used in our country as wearing apparel, but only as blankets, lounge coverings, portières, or rugs. They are uniformly known in commerce and trade as blankets, and as such are provided for eo nomine in paragraph 367, as claimed in the protest.

The contention of the Government that because of the other uses these articles are put to they should be classified as shawls or wearing apparel is not well taken, for if a blanket which is sometimes worn on the person can be called a shawl, so might a shawl which may sometimes be used as a covering during the night be called a blanket. Classification can not be altered by this method.

On December 2, 1903, in the case of Haynes & Co., G. A. 5498 (T. D. 24819), the board reviewed the previous decisions upon the subject and held that under the tariff act of 1890 wool traveling rugs were dutiable under the provision for "all manufactures of wool of every description," and not under the provision for "rugs." No claim for a classification of the articles as blankets was made in the case.

On October 29, 1912, the department issued a ruling upon the subject, which reflects so directly upon the present question that it will be copied here in full:

(T. D. 32899.)

TREASURY DEPARTMENT, *October 29, 1912.*

SIR: The department duly received your letter of the 4th instant in regard to the proper classification of merchandise invoiced as "woolen rugs" or "auto rugs," which you state consist of woolen rugs made of wool or camel's hair, about 70 by 90 inches.

It appears that the merchandise under consideration ranges in dimensions from those which are square to those of the sizes mentioned above and that some have an edging of silk at each end, while others have this edging on all four sides.

You further state that the merchandise is sold as automobile or traveling rugs in some departments and is carried in other departments as blankets, and that some importers invoice the goods as woolen rugs, while others invoice them as blankets.

In the opinion of the department, the provision in paragraph 379 of the tariff act should be limited to blankets which are known and used as bed blankets and horse blankets.

Following the decision of the Board of United States General Appraisers, G. A. 5498 (T. D. 24819), wherein it was held that woolen traveling rugs imported under the tariff act of 1890 were properly dutiable as manufactures of wool of every description made wholly or in part of wool, the department is further of the opinion that the rugs, the subject of your letter, are properly dutiable under paragraph 378 of the tariff act. You will be governed accordingly.

Respectfully,                                                JAMES F. CURTIS,
    (96657.)                                                *Assistant Secretary.*
COLLECTOR OF CUSTOMS, *New York.*

It may be noted that the foregoing ruling related to the eo nomine provision for blankets which appeared in paragraph 379 of the tariff act of 1909. At the time of the enactment of that paragraph Congress had before it a definition of the word "blanket" in Notes on Tariff Revision, 1909 (479), in the following terms: "A blanket is

a heavy cover for a bed or a horse, with a thick, soft nap on both sides." The Treasury ruling above copied made plain the fact that such a definition of the term in question was accepted and enforced by the department.

The Treasury ruling just copied was of course before Congress when it revised the tariff in 1913 and it is safe to assume that the term "blanket" was used in the tariff act then enacted with the meaning and effect which the department had thus placed upon it. Had Congress designed to change this procedure appropriate language would doubtless have been used for that purpose. Instead, however, of such an indication of legislative purpose the word was used alone as in former acts, and presumably with the same signification as in those acts.

We are therefore convinced that the merchandise in question is not "blankets" within the purview of paragraph 289 of the act of 1913, and the board's decision to that effect is *affirmed.*